## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

EDWARD CARR,

    *Plaintiff*,

*v.*                          CASE NO. 12-CV-14426

COMMISSIONER OF            DISTRICT JUDGE PAUL D. BORMAN
SOCIAL SECURITY,          MAGISTRATE JUDGE CHARLES E. BINDER

    *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

### II.    REPORT

#### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for a period of disability, Disability Insurance

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Benefits ("DIB"), and Supplemental Security Income ("SSI") benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 8, 13.)

Plaintiff Edward Carr was 35 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 6 at 27.) Plaintiff's work history includes employment as an assembly line worker for one year and as a general laborer for thirteen years. (Tr. at 125.) Plaintiff filed the instant claims on October 29, 2009, alleging that he became unable to work on September 18, 2009. (Tr. at 96, 100.) The claims were denied at the initial administrative stages. (Tr. at 37, 38.) In denying Plaintiff's claims, the Commissioner considered peripheral neuropathy and disorders of the back, discogenic and degenerative, as possible bases for disability. (*Id.*) On April 12, 2011, Plaintiff appeared before Administrative Law Judge ("ALJ") Andrew Sloss, who considered the application for benefits *de novo*. (Tr. at 8-22, 24-36.) In a decision dated April 22, 2011, the ALJ found that Plaintiff was not disabled. (Tr. at 18.) Plaintiff requested a review of this decision. (Tr. at 7.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on August 8, 2012, when, after review of additional exhibits[2] (Tr. at 93-95, 513-18), the Appeals Council denied Plaintiff's request for review. (Tr. at 1-6.) On October 6, 2012, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

### B.    Standard of Review

---

[2]In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d

at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability"). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record,

4

regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

## C.     Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the SSI program of Title XVI, 42 U.S.C. §§ 1381 *et seq.* Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D.    ALJ Findings**

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through September 30, 2010, and that Plaintiff had not engaged in substantial gainful activity since September 18, 2009, the alleged onset date. (Tr. at 13.) At step two, the ALJ found that Plaintiff's status post gunshot wound (with abdominal surgery), post hernia surgery, obesity, mild left ulnar neuropathy, and neuropathy in both lower extremities was "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 15.) At step four, the ALJ found that Plaintiff could not perform any past relevant work. (Tr. at 16.) The ALJ also found that as of the alleged disability onset date, Plaintiff was 33 years old, which put him in the "younger individual age 18 - 44" category. *See* 20 C.F.R. §§ 404.1563 and 416.963. At step five, the ALJ found that Plaintiff could perform a limited range of sedentary work. (Tr. at 15-16.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 17-18.)

### E.    Administrative Record

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff "got shot on September 18, 2009." (Tr. at 28.) Plaintiff underwent surgery that day for "[m]ultiple perforating gunshot [shotgun] wounds with recent hemorrhage" to the right side of his abdomen and "[c]hronic cholecystitis[.]" (Tr. at 184, 188, 240-41, 272-74, 292-386, 438-59.) A bowel resection, abdominal washout, "Blake drain placement" and "[a]bdominal wound VAC placement" were performed during surgery. (Tr. at 189, 194, 196, 282-83, 286-91.) An echocardiogram showed metal consistent with gunshot fragments in the right ventricle of Plaintiff's heart, but was otherwise normal. (Tr. at 204, 207, 274, 390-91.) After surgery, Plaintiff participated in rehabilitation through October 2009. (Tr. at 246-59.)

On October 22, 2009, Faisal Ahmad, M.D., performed an EMG on Plaintiff which showed "electrodiagnostic evidence of a moderate to severe, generalized, large fiber, predominantly axonal peripheral neuropathy with profuse, active denervation in the distal lower extremity muscles" and "no electrodiagnostic evidence of a radiculopathy, plexopathy or mononeuropathy affecting either lower extremity." (Tr. at 224, 489.)

On November 4, 2009, a CT scan of the lumbar spine showed "[n]o evidence of fracture or subluxation in the lumbar spine," "[m]ild circumferential bulging of the intervertebral disc at L3-L4, L4-L5, and L5-S1" and "[n]o evidence of spinal stenosis." (Tr. at 214.)

On November 11, 2009, Dr. Ahmad performed an EMG on Plaintiff which showed "mild left ulnar mononeuropathy characterized by conductive velocity slowing across the elbow without active denervation[,]" "no electrodiagnostic evidence of right upper extremity mononeuropathy such as carpal tunnel or ulnar mononeuropathy[,]" and "no electro diagnostic evidence of a brachial plexopathy or cervical radiculopathy on either side or evidence of a generalized large fiber peripheral polyneuropathy affecting the upper extremities." (Tr. at 213.)

Chest x-rays taken on November 12, 2009, showed "small left sided pleural effusion, slightly improved in the interval[,] otherwise, unremarkable study." (Tr. at 231, 484.) The pleural effusion was then drained by radiology. (Tr. at 244.)

On February 22, 2010, Plaintiff was examined by Carrie Gleason, Psy.D., LLP. (Tr. at 393-96.) Dr. Gleason described Plaintiff's complaints and symptoms as follows:

> Edward said he was diagnosed with bipolar around 2000 while psychiatrically hospitalized at Hurley for a breakdown. Edward says he gets angry at times and turns into a "gangster." He gave an example of getting into a fight at the bar. He said some days he can be the nicest guy in the world, and other times he is angry. Edward said his anger started in 1988 after being charged as a minor with negligent homicide manslaughter with a vehicle. He was sentenced to probation. He said he was fourteen when his uncles and cousin were fighting in the car. Edward took the wheel and the car hit a tree and the uncle died. He said he was an average teenager prior to the

8

accident. Edward says he feels angry 'almost every other day. Some days are better than others.' Edward said he is paranoid since being shot. He said he was shot September 18, 2009. He said the person, whom he knows, is still on the streets.

(Tr. at 393.) As to daily activities, Dr. Gleason noted:

> Edward currently resides with [his] wife and his two stepchildren. His three children live with their mothers. He agreed that he has a relationship with his children. Edward generally spends the days as follows: go to doctor's appointments, watch TV, and ride with his wife while running errands. Edward is able to do cooking, cleaning and laundry. He said his wife does the laundry. He does not think he is capable of lifting a basket full of clothes. Edward is independent in self-care and personal hygiene. Edward reported being able to grocery shop independently, but said he is not able to carry heavy bags. He said his feet go numb after walking long distances. Edward is able to pay bills and count money. Edward is currently being supported by his wife's income. Edward's driver's license was suspended due to an OWI charge.

(Tr. at 394.) Dr. Gleason found that Plaintiff's "speech was unimpaired" and his "stream of mental activity was spontaneous and organized." (Tr. at 395.) Dr. Gleason also found that there was "no significant evidence of hallucinations, delusions, persecutions, obsessions, thoughts controlled by others, or unusual powers" because, although Plaintiff indicated he thought he had seen "ET," Plaintiff "agreed that he was abusing drugs at the time." (*Id.*) Dr. Gleason concluded that Plaintiff's "mental abilities to understand, attend to, remember, and carry out instructions are not impaired. Edward's abilities to respond appropriately to co-workers and supervision and to adapt to change and stress in the workplace are mildly impaired." (Tr. at 396.) Dr. Gleason further opined that "[o]verall, based on today's exam and all the information available to me at this time, it is my impression that Edward's psychological condition would mildly impair his ability to perform work related activities." (*Id.*) Dr. Gleason diagnosed Mood Disorder, NOS; Alcohol Dependence, Early Full Remission; and a history of polysubstance abuse; he assessed a GAF score of 62 and gave a guarded prognosis. (*Id.*)

On February 23, 2010, Neil A. Friedman, M.D., completed a neurologic and orthopedic supplemental report regarding Plaintiff's abilities. (Tr. at 399-400.) Dr. Friedman found that Plaintiff's current abilities include being able to perform all tasks except being limited in his ability to bend, carry, push, and pull. (Tr. at 399.) Dr. Friedman also noted that Plaintiff's upper extremity reflexes were all normal but that his lower extremity reflexes were absent. (*Id.*) Plaintiff was able to walk on heels and toes and tandem walk, and his gait was stable and within normal limits. (Tr. at 400.) Plaintiff's strength in his extremities was 5/5. (*Id.*) Plaintiff's range of motion in his cervical spine, shoulder, elbow, hip, knee, ankle, wrist, and hands/fingers were all normal and his lumbar spine flexion was normal, but his extension and right and left lateral flexion were 0 to 20 degrees while normal is 0 to 25 degrees. (Tr. at 401-02.) Dr. Friedman opined that "[b]ased on today's examination, the claimant should be able to work eight hours a day with restriction. His restrictions would include no lifting > 10 lbs. and no repetitive bending, stooping or twisting." (Tr. at 405.)

A Physical Residual Functional Capacity ("RFC") Assessment was completed on March 3, 2010, by Warren Davis, a Single Decisionmaker ("SDM"). (Tr. at 408-15.) The assessment concluded that Plaintiff could occasionally lift 10 pounds, frequently lift 10 pounds, stand or walk for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and was unlimited in his ability to push or pull. (Tr. at 409.) The assessment found that Plaintiff should never climb ladders, ropes, or scaffolds, could frequently balance, but was otherwise occasionally limited in the remaining postural areas. (Tr. at 410.) There were no manipulative, visual, communicative, or environmental limitations established. (Tr. at 411-12.) The assessment noted that its findings were not significantly different from those of Dr. Friedman on February 23, 2010. (Tr. at 414.)

10

A Psychiatric Review Technique was completed on March 12, 2010, by Leonard C. Balunas, Ph.D. (Tr. at 416-29.) Dr. Balunas diagnosed affective disorders, i.e., Mood Disorder, NOS, and alcohol dependence in early full remission. (Tr. at 416, 419, 424.) Dr. Balunas concluded that Plaintiff has no restrictions as to activities of daily living, nor as to maintaining concentration, persistence or pace, but is mildly limited in maintaining social functioning. (Tr. at 426.) Dr. Balunas therefore concluded that Plaintiff's mental impairment "is not severe." (Tr. at 428.)

Plaintiff was treated for abdominal pain by Ali Eskander, M.D. (Tr. at 467-83.) On March 29, 2010, Dr. Eskander performed successful surgery to repair Plaintiff's incisional hernia. (Tr. at 436, 462-66.)

On April 30, 2010, an echocardiogram showed normal left ventricular size and systolic function, mild concentric ventricular hypertrophy, normal diastolic function, and no significant valvular abnormality. (Tr. at 486.) On May 11, 2010, Plaintiff was examined by M. Luay Alkotob, M.D., who noted that Plaintiff was "doing very well" and that his "repeat echo[cardiogram] [was] generally normal." (Tr. at 487-88, 491.)

On June 7, 2010, Plaintiff was given a psychiatric evaluation by Michael Gotlib, M.D. (Tr. at 492-94.) Dr. Gotlib noted that Plaintiff "got into an automobile accident when he was drunk. He lost his car and was fired from his job. . . . He is here today because he got shot and applied for disability." (Tr. at 492.) Dr. Gotlib further noted that Plaintiff "reports no psychotic symptoms or hallucinations or delusions. He reports mood swings. He reports no anxiety symptoms." (*Id.*) Dr. Gotlib found Plaintiff was "[a]lert and oriented times three[,]" that he had "[g]ood recent, remote and immediate memory[,]" that his thought process exhibited "[g]oal directed speech[,]" and that his insight was fair, but found that Plaintiff's fund of information and judgment were poor, noting that Plaintiff was a poor historian and could not remember the names of his medications. (Tr. at

493-94.) Dr. Gotlib diagnosed polysusbtance abuse in partial remission, and to rule out bipolar disorder, and he assessed a GAF score of 45. (Tr. at 494.)

Plaintiff also participated in therapy with M.E. Rett, MSW. (Tr. at 495-506, 508.)

On March 1, 2011, a Medical Source Statement was completed by N. Aditya, M.D. (Tr. at 507, 510.) Dr. Aditya opined that based on Plaintiff's peripheral neuropathy, Plaintiff could occasionally lift 20 pounds, frequently lift less than 10 pounds, could stand or walk less than 2 hours, could sit less than 6 hours of an 8-hour day and was unlimited in pushing and pulling. (*Id.*)

On March 10, 2011, Plaintiff's therapist, M.E. Rett, completed a Medical Source Statement wherein she stated that Plaintiff was markedly limited in the ability to relate and interact with supervisors and co-workers, the ability to deal with the public, and the ability to withstand stress and pressures associated with work, but was not significantly limited in his ability to understand, remember, and carry out either simple one-or-two step or complex job instructions, yet was moderately limited in his ability to maintain concentration and attention for at least two-hour increments. (Tr. at 508.)

On April 9, 2011, a Medical Source Statement was completed by Dr. Ahmad. (Tr. at 509, 512.) Dr. Ahmad opined that, based on Plaintiff's peripheral neuropathy, Plaintiff could occasionally lift 10 pounds, frequently lift or carry less than 10 pounds, stand or walk less than 2 hours, sit less than 6 hours, and was moderately limited in his ability to push and pull. (*Id.*) Dr. Ahmad indicted that Plaintiff's limitations would likely disrupt a regular job schedule 60 out of 160 hours per month. (*Id.*)

At the administrative hearing, Plaintiff testified that he has numbness in both of his feet everyday and that if he stands too long, his back hurts. (Tr. at 28-29.) Plaintiff also stated that because of the mesh in his stomach, he cannot lie on his stomach. (Tr. at 29.) Plaintiff stated that

although he has pain in his back, he is not receiving any treatment for that and that although he has

numbness in his hands and arms, he is able to hold a coffee cup and write with a pen. (Tr. at 29-30.)

As to psychological symptoms, Plaintiff testified that he recently was diagnosed with bipolar

disorder and that he is "paranoid, I seclude . . . I don't trust nobody . . . I got a limited amount of

friends and I ain't able to - - I don't like too much negativity being around me." (Tr. at 30.) When

asked whether these psychological symptoms began around the time of the gunshot, Plaintiff

answered in the negative and stated that they had been going on for some time. (*Id.*) When asked

whether the medication helps with his mental impairments, Plaintiff responded, "I guess." (Tr. at

30-31.) When asked how he spends his day, Plaintiff stated:

> I probably try to get me something to eat, watch TV, spend time with my wife when
> she can spend time with me. Basically, I don't do too much. And when I got business
> to take care of, that's when I leave out. But most of all, my days just like basically,
> just stay around the house, watch TV, and that's about it. I don't really - - unless it's
> something I gotta do, it's mandatory I got some business to take care of. I mean, I'm
> unemployed right now, you know, and everything. So I mean, the price of gas and
> everything, I mean I just - - financially, I just stay in one spot. I don't really do much.

(Tr. at 31.)

At the administrative hearing, the ALJ asked the Vocational Expert ("VE") to consider an

individual with Plaintiff's background who

> is able to perform sedentary work as defined by the regulations, except that he can
> never climb ladders, ropes or scaffolds and can only occasionally climb ramps or
> stairs. He can frequently balance, but can only occasionally stoop, crouch, kneel, or
> crawl.

(Tr. at 34.) The VE responded that such a person could perform the 1,700 assembler, 1,300 machine

operator, and 600 inspector jobs available in the State of Michigan. (*Id.*) The ALJ then asked the

VE whether, assuming that due to "a combination of his medical conditions and associated pain,

as well as his psychological symptoms, this person is unable to engage in sustained work activity

for a full eight-hour day, five days a week for a forty-hour week or an equivalent work schedule,

. . . competitive work at all exertional levels [would] be precluded for such an individual[,]" to which the VE responded that it would. (Tr. at 34-35.) In response to the ALJ's question, the VE confirmed that her testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. at 35.)

### F.    Analysis and Conclusions

### 1.    Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, he possessed the residual functional capacity to perform a limited range of sedentary work. (Tr. at 15-16.) Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a)(1991). Social Security Ruling 83-10 clarifies this definition:

> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

SSR 83-10, 1983 WL 31251, at *5.

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 8.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that the ALJ "erred as a matter of law in assessing Edward Carr's credibility and by failing to properly evaluate the medical records of evidence and, thereby, forming an inaccurate hypothetical that did not accurately portray Edward Carr's impairments." (Doc. 8 at 6.) Plaintiff also argues that the ALJ "erred in completely ignoring the Medical Source Statements provide [sic] simply dismissing them because he did not have their treatment records." (*Id.* at 15.)

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789 at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). When weighing credibility, an ALJ may give less weight to the testimony of interested witnesses. *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982) ("a trier of fact is not required to ignore

incentives in resolving issues of credibility"); *Krupa v. Comm'r of Soc. Sec.*, No. 98-3070, 1999 WL 98645, at *3 (6th Cir. Feb. 11, 1999) (unpublished). However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p. In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *See id.*; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms. Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *Id.* Although a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," C.F.R. §§ 404.1528(a), 416.929(a), "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded *solely* because they are not substantiated by objective medical evidence." SSR 96-7p, at *1 (emphasis added). Instead, the ALJ must consider the following factors:

(i)      [D]aily activities;

(ii)     The location, duration, frequency, and intensity of . . . pain;

(iii)    Precipitating and aggravating factors;

(iv)     The type, dosage, effectiveness, and side effects of any medication . . . taken
         to alleviate . . . pain or other symptoms;

(v)      Treatment, other than medication, . . . received for relief of . . . pain;

(vi)     Any measures . . . used to relieve . . . pain.

*Felisky*, 35 F.3d at 1039-40; SSR 96-7p, at *3. Furthermore, the consistency of the evidence,

including a claimant's subjective statements, is relevant in determining a claimant's credibility. 20

C.F.R. § 404.1527(c); SSR 96-7p, at *5.

In the instant case, the ALJ thoroughly considered each of the above factors. (Tr. at 15-16.)

The ALJ found that "the claimant's medically determinable impairments could reasonably be

expected to cause the alleged symptoms; however, the claimant's statements concerning the

intensity, persistence and limiting effects of these symptoms are not credible to the extent they are

inconsistent with the above residual functional capacity assessment." (Tr. at 16.) I suggest that the

ALJ's findings are supported by substantial evidence.

The evidence reveals that Plaintiff suffered some long-term consequences from having been

shot in the abdomen, including "Blake drain placement" and "[a]bdominal wound VAC placement"

(Tr. at 189, 194, 196, 282-83, 286-91), metal consistent with gunshot fragments in the right

ventricle of Plaintiff's heart (Tr. at 204, 207, 274, 390-91), and peripheral neuropathy. (Tr. at 224,

489.) However, there is no medical evidence that these conditions are disabling. As Dr. Ahmad

observed, there was "no electrodiagnostic evidence of a radiculopathy, plexopathy or mono-

neuropathy affecting either lower extremity." (Tr. at 224, 489.) In addition, Dr. Ahmad concluded

that the EMG showed only "mild left ulnar mononeuropathy characterized by conductive velocity

slowing across the elbow without active denervation[,]" "no electrodiagnostic evidence of right upper extremity mononeuropathy such as carpal tunnel or ulnar mononeuropathy[,]" and "no electro diagnostic evidence of a brachial plexopathy or cervical radiculopathy on either side or evidence of a generalized large fiber peripheral polyneuropathy affecting the upper extremities." (Tr. at 213.) Similarly, a CT scan of the lumbar spine showed "[n]o evidence of fracture or subluxation in the lumbar spine," "[m]ild circumferential bulging of the intervertebral disc at L3-L4, L4-L5, and L5-S1," and "[n]o evidence of spinal stenosis." (Tr. at 214.)

In addition, Dr. Friedman found that Plaintiff was able to walk on his heels and toes and tandem walk, and that his gait was stable and within normal limits. (Tr. at 400.) Plaintiff's strength in his extremities was 5/5. (*Id.*) Plaintiff's range of motion in his cervical spine, shoulder, elbow, hip, knee, ankle, hands/fingers, and wrist were all normal and his lumbar spine flexion was normal, but his extension and right and left lateral flexion were 0 to 20 degrees while normal is 0 to 25 degrees. (Tr. at 401-02.) Dr. Friedman opined that "[b]ased on today's examination, the claimant should be able to work eight hours a day with restriction. His restrictions would include no lifting > 10 lbs. and no repetitive bending, stooping or twisting." (Tr. at 405.) Finally, as Dr. Alkotob noted, a 2010 echocardiogram was "generally normal" and Plaintiff was doing very well. (Tr. at 487-88, 491.)

As to mental impairments, Dr. Gleason noted that Plaintiff's "speech was unimpaired" and his "stream of mental activity was spontaneous and organized." (Tr. at 395.) Dr. Gleason concluded that Plaintiff's "mental abilities to understand, attend to, remember, and carry out instructions are not impaired" and his "abilities to respond appropriately to co-workers and supervision and to adapt to change and stress in the workplace are mildly impaired." (Tr. at 396.) Therefore, Dr. Gleason further opined that "[o]verall, based on today's exam and all the information available to me at this

time, it is my impression that Edward's psychological condition would mildly impair his ability to perform work related activities." (*Id.*)

In addition, Dr. Balunas concluded that Plaintiff has no restrictions as to activities of daily living, nor as to maintaining concentration, persistence or pace, but is mildly limited in maintaining social functioning. (Tr. at 426.) Dr. Balunas concluded that Plaintiff's mental impairment "is not severe." (Tr. at 428.) Similarly, Dr. Gotlib noted that Plaintiff "reports no psychotic symptoms or hallucinations or delusions" and that he "reports no anxiety symptoms," although he "reports mood swings." (*Id.*) Dr. Gotlib found Plaintiff was "[a]lert and oriented times three[,]" that he demonstrated "[g]ood recent, remote and immediate memory[,]" that his thought process exhibited "[g]oal directed speech[,]" and that his insight was fair, although Dr. Gotlib found that Plaintiff's fund of information and judgment were poor, noting that Plaintiff was a poor historian and could not remember the names of his medications. (Tr. at 493-94.)

I also note that Plaintiff was treated with prescription medications only, and such modest treatment is inconsistent with a finding of disability. *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 (6th Cir. 2011); *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 334-35 (6th Cir. 2007). I therefore suggest that substantial evidence supports the ALJ's conclusions.

I further suggest that these findings are not undermined by Plaintiff's argument that the ALJ did not give deference to the medical source statements submitted by Dr. Ahmad, Dr. Aditya, or Therapist Rett. First of all, Rett's opinion is not entitled to controlling weight because it is not an opinion of a treating source as defined in the regulations. *See* 20 C.F.R. § 404.1513(a); *Miller v. Comm'r of Soc. Sec.*, No. 1:08-CV-1022, 2010 WL 502761, at *5 (W.D. Mich. Feb. 5, 2010) (citing *Doolin v. Astrue*, No. 3:08-cv-243, 2009 WL 1212232, at *8 (S.D. Ohio May 1, 2009) ("a counselor's opinion is not entitled to controlling weight")). I further suggest that there is no

19

evidence that Dr. Aditya was a treating source. The administrative record contains no record of Dr. Aditya treating Plaintiff, and a physician qualifies as a treating source only if the claimant sees the physician "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." 20 C.F.R. § 404.1502.

Furthermore, even if Dr. Aditya was a treating source as was Dr. Ahmad, I suggest that neither of their opinions are entitled to any significant weight. Both Drs. Aditya and Ahmad submitted single-page, conclusory check-box forms which contained no citations to results of tests, observations, or other medical findings. (Tr. at 509-12.) Under these circumstances, I suggest that the ALJ was free to discount their conclusions and committed no error in doing so. *See Teague v. Astrue*, 638 F.3d 611, 616 (8th Cir. 2011) (holding that ALJ properly discounted doctor's opinions on a check-off form which "did not cite clinical test results, observations, or other objective findings as a basis for determining [the plaintiff's] capabilities"); *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (holding that the ALJ properly discounted the treating physician's opinion that consisted of checklist forms which cited no medical evidence and provided little or no elaboration).

I therefore suggest that the ALJ's finding that Plaintiff was not fully credible and is not disabled is supported by substantial evidence and should not be disturbed.

### 3.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III.   REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97.  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.



                                        s/ 𝕮𝖍𝖆𝖗𝖑𝖊𝖘 𝕰 𝕭𝖎𝖓𝖉𝖊𝖗
                                        CHARLES E. BINDER
Dated: October 1, 2013                  United States Magistrate Judge




### CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  October 1, 2013                  By  s/Patricia T. Morris
                                           Law Clerk to Magistrate Judge Binder

21